# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WES NEWMAN, individually and on behalf of others similarly situated, | ) ) | Case No. 1:24-cv-03188 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTEGRITY MARKETING GROUP, LLC, | ) | **Jury Trial Demanded** |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

1.      The Telephone Consumer Protection Act ("TCPA") protects consumers from the nuisance and privacy invasion inherent in unwanted telemarketing, through broad prohibitions against nonconsensual robocalling, telemarketing to phone numbers subject to a do-not-call request, or telephone solicitations to phone numbers on the National Do Not Call Registry, among other things. 47 C.F.R. § 64.1200(a)(2)-(3), (c)(2), (d).

2.      Defendant Integrity Marketing Group, LLC ("Integrity") is a distributor of life insurance, Medicare-related health insurance, and other products, which it telemarkets through a network of subsidiaries and other partners in this District and nationwide.

3.      Integrity controls the telemarketing conducted on behalf of itself and its subsidiaries through uniform policies and practices, as well as through back-end support that provides its agents with a centralized platform for maintaining lead or consumer relationship management data, obtaining marketing assistance, and facilitating consumer purchases.

4.      Integrity's TCPA policies and practices are ineffective, and Integrity fails to properly enforce them, which has caused Plaintiff and other consumers to incur TCPA violations on a massive scale. Oftentimes, as in Plaintiff's case, the consumer receives TCPA violations through multiple Integrity downlines, with no real ability to stop the calls due to the anonymous

nature of the calling and Integrity's refusal to properly coordinate TCPA compliance.

5.      Specifically, the TCPA prohibits companies like Integrity and its subsidiaries from accepting business through telemarketing without first instituting procedures to prevent calls to consumers who ask not to be called. 47 C.F.R. § 64.1200(d) (the internal do-not-call or "IDNC" rule).

6.      Integrity violates the TCPA's IDNC rule by: (1) failing to ensure that it and its telemarketers have a valid written internal do-not-call policy as required by 47 C.F.R. § 64.1200(d)(1); (2) failing to ensure proper telemarketing training as required by 47 C.F.R. § 64.1200(d)(2); (3) failing to properly coordinate and honor do-not-call requests amongst its various agents and telemarketers as required by 47 C.F.R. § 64.1200(d)(3); and (4) permitting its telemarketers to use fake names and spoofed numbers that hide who is calling and Integrity's identity, despite 47 C.F.R. § 64.1200(d)(4)'s requirement that the caller and seller be identified.

7.      Integrity's widescale IDNC noncompliance is reflected in the violations Plaintiff experienced, in which he received numerous, spoofed-number telemarketing calls beginning in fall 2021, after he repeatedly asked not to be contacted. Although these calls in virtually every instant began with the caller using a generic, fake name, they trace to agents affiliated with Integrity partners, including (1) at least two telemarketing calls that traced to Integrity subsidiary Connexion Point on November 19, 2021, *see* Paragraphs 65-80, infra; (2) at least two telemarketing calls that traced to Integrity subsidiary Berwick Insurance Group on December 7, 2021, *see* Paragraphs 81-92, infra; (3) at least one telemarketing call that traced to Integrity subsidiary Your Insurance Group on January 16, 2022, *see* Paragraphs 102-107, infra; and (4) approximately thirty-four or more telemarketing calls that traced to Integrity subsidiary Family First Life between February 1, 2022 and July 21, 2023, *see* Paragraphs 108-225, infra. Most of

these calls occurred after Plaintiff complained directly to Integrity about the calling on December 17, 2021.

8. All of these calls violated the TCPA's separate prohibition against initiating telephone solicitations to telephone numbers on the National Do Not Call Registry ("NDNCR"), too, since Plaintiff's phone number has been on the NDNCR since 2005. 47 C.F.R. § 64.1200(c)(2); *see* Paragraph 57, 272-279, infra.

9. The TCPA also prohibits making any telemarketing call using an artificial or prerecorded voice to a cell phone number or residential landline without "prior express written consent." 47 C.F.R. § 64.1200(d).

10. However, Integrity caused Plaintiff to receive at least ten nonconsensual, prerecorded-voice telemarketing calls between April 28, 2022 and July 21, 2023. *See* Paragraphs 152-153, 168, 177, 214-225, infra. On at least one of these calls, Plaintiff was directly transferred to an agent with Integrity subsidiary and partner Family First Life. *See* Paragraphs 219-222, infra (July 12, 2023).

11. Integrity should be held liable for these calls, even if it did not "initiate" them. Despite knowing for years that its practices result in illegal calls, and that its internal do-not-call list is incomplete, it continues to accept business derived therefrom: Indeed, Plaintiff maintained direct contact with Integrity's in-house and outside counsel over the course of several months to try to get these calls to stop, to no avail.

12. Given the extent of calls Plaintiff received across multiple Integrity downlines, TCPA noncompliance is a systemic problem that Integrity and its marketing partners have failed to properly address. Plaintiff therefore brings this class action for injunctive relief and money damages against Integrity, on behalf of himself and others who similarly incurred TCPA

robocall, IDNC, and NDNCR violations as a result of Integrity's and its partners' wrongful practices.

## INTRODUCTION

13.     Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective.  However, this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money.  As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses.  As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes….  Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

14.     As is relevant here, federal law under the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using … an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).  For such calls that introduce advertising or constitute telemarketing, prior express written consent is required. 47 C.F.R. § 64.1200(a)(2), (f)(9). The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation of this prohibition, which can be trebled where the statute was "willfully or knowingly" violated.  47 U.S.C. § 227(b)(3).

15.     The TCPA's regulations also provide that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her

telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). The TCPA further prohibits "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]" 47 C.F.R. § 64.1200(d). The TCPA affords any person who has received more than one call by or on behalf of the same entity in violation of either of these provisions, within any 12-month period, to injunctive relief and the greater of actual damages or up to $500 per violation. 47 U.S.C. § 227(c)(5). This can similarly be trebled where the regulations were "willfully or knowingly" violated. *Id.*

## PARTIES

16.     Plaintiff Wes Newman is a natural person who resides in Cook County, Illinois. Plaintiff received the calling at issue in this case to his residential cell phone number while in this District. His cell phone number is tied to a personal, non-business account, for which Plaintiff is the subscriber.

17.     Defendant Integrity Marketing Group, LLC is a Delaware limited liability company with its principal place of business at 1445 Ross Avenue, 40th Floor, Dallas, TX 75202. Integrity does regular and continuous business in Illinois, including in this District.

18.     Integrity specifically authorizes those that telemarket its products and services to market and develop business for it in Illinois, including with regard to the telemarketing calls Plaintiff received here.

19.     DOES 1-10 are yet-unnamed persons or entities involved in facilitating the lead generation or calling at issue.

## JURISDICTION AND VENUE

20.     This Court has federal question subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Fin. Servs.,*

*Inc.*, 565 U.S. 368, 372 (2012).

21.     The Court also has Class Action Fairness Act jurisdiction, because the nationwide

classes are each comprised of thousands of members, at least one class member is a citizen of a

different state from where any Defendant is a citizen, and because the aggregate damages exceed

$5,000,000, exclusive of fees, costs and interest.

22.     The Court has personal jurisdiction over Integrity because it authorized its agents

to solicit business through the outbound telephone calls that are the subject of this lawsuit into

the State of Illinois for the purpose of soliciting Plaintiff and other class members for its products

and services.

23.     Integrity authorized its agents and telemarketers to use its tradename and to

provide quotations for insurance-related products and services through it during such calling,

thus creating the reasonable – and true – impression for Plaintiff and other call recipients that

Integrity authorized the solicitation calls.

24.     Integrity ratified the telemarketing that is the subject of this case by willfully and

knowingly generating revenue and advertising benefits arising from such telemarketing on its

behalf.

25.     Venue is appropriate in this District because Plaintiff received the calls that are

the subject of this case while in this District, and because a substantial part of the events or

omissions giving rise to the claim at issue occurred here.

**FACTS**

26.     Integrity develops and distributes life and health insurance and other products, which it telemarkets to consumers through a network of subsidiaries, insurance agents, and (sub)vendors.

27.     Integrity's written and unwritten policies, practices, and procedures provide it with absolute control over telemarketing conducted on its behalf.

28.     Integrity achieves this control through issuing standard policies as well as other directions and instructions that apply to <u>all</u> entities that telemarket on its behalf. Integrity's TCPA-related mandates and other directives are the same for each entity or person telemarketing its goods and services.

29.     Indeed, Integrity participates in the telemarketing directly, such as by providing a platform through which its agents can obtain leads of consumers to call, for purpose of encouraging them to purchase products and services through Integrity and its subsidiaries or other partners.

30.     Integrity's agent platform also records its agents' sales calls, which Integrity then stores.

31.     Integrity also provides and approves the script used during sales calls by those telemarketing on its behalf.

32.     Integrity also has the right to tell its agents which telemarketing or lead generation vendors they can or cannot use to solicit business on its behalf.

33.     These policies, practices, and procedures are identical for anyone telemarketing through or on behalf of Integrity, regardless of vendor/agent or what products or services are being offered.

34.     Integrity's policies, practices, and procedures *in toto*, as implemented by Integrity and its marketers, do not comport with the TCPA.

35.     Integrity's and its telemarketers' internal do-not-call lists—to the extent they have one—are incomplete because it does not include all of the phone numbers of persons who asked not to receive calls on behalf of Integrity and its marketing partners.

36.     The above problem exists not because one or more of Integrity's vendors is doing a bad job of coordinating internal do-not-call lists; the problem exists because Integrity has turned a blind eye to ensuring coordination of do-not-call request information, instead using the resources necessary to ensure coordination to focus on making its business more profitable.

37.     Integrity knows that its and its agents' and (sub)vendors' internal do-not-call lists are incomplete, but it willfully continues to permit telemarketing to such numbers (and to retain profits from resulting sales), regardless.

38.     On information and belief, including based on Integrity's indifference to Plaintiff's complaints, Integrity's across-the-board TCPA policies, practices, and procedures also impermissibly permit its telemarketers to call consumer telephone numbers if they believe they have a marketing opt-in obtained from a third party.

39.     However, the TCPA prohibits *all* telemarketing calls to a telephone number that is (or should be) on one's internal do-not-call list. 47 C.F.R. § 64.1200(d)(3), (6).

40.     Integrity's practices also permit its agents and (sub)vendors to engage in telemarketing without identifying the caller or Integrity, or providing a phone number or address at which the consumer can be contacted for purposes of requesting not to be called. *See* 47 C.F.R. § 64.1200(d)(4).

41.     Along that vein, calls to Plaintiff and other class members also "spoofed" the

caller ID to make it appear that the calls originated from someone other than the true caller, thus increasing the likelihood that recipients would answer and listen to the sales pitch.

42. Integrity's telemarketers also routinely use a fake name; as Plaintiff experienced, the only way to determine who is behind the call for purposes of trying to get it to stop is to feign interest and try to get transferred to an insurance agent.

43. Spoofing and the use of fake business names has the purpose and effect of lowering the probability that Integrity (or its agents and (sub)vendors) will get caught in making illegal telemarketing calls.

44. The fact that the telemarketer does not identify the caller or seller during each call in many instances (if at all), let alone provides a contact phone number or address, permits Integrity's marketing vendors to make a shocking number of telemarketing calls with relative impunity.

45. As Plaintiff experienced, Integrity's telemarketers also engage in prerecorded-voice telemarketing and call numbers on the National Do Not Call Registry, as well.

46. Integrity expressly authorizes insurance agents and subagents to hire telemarketers and lead suppliers to make outbound telemarketing calls on Integrity's behalf.

47. Plaintiff and other class members reasonably believed Integrity authorized the calls at issue, based on Integrity's own actions—including through it permitting its agents and telemarketers to use its and its subsidiaries' tradenames during such marketing, permitting them access to proprietary lead and platform information used in such calls, and retaining revenue as a result of the goods and services purchased as a result.

48. Integrity knows that those telemarketing on its behalf do so to consumers who did not consent to be called, including despite a prior do-not-call request, the number's registration

on the National Do Not Call Registry, and/or using an artificial or prerecorded voice, but it continues to accept the benefits derived from such, anyway, ratifying the calling.

49.     Instead of repudiating the calls and business derived therefrom, Integrity knowingly continued to enjoy the benefits of the marketing, such as the advertising benefit and acceptance of revenue via new customers or sales derived therefrom.

50.     Integrity's actions and omissions with regard to the telemarketing complained of herein justify a reasonable assumption that it consented to the telemarketing at issue.

51.     Alternatively, to the extent Integrity lacked full knowledge about every aspect of the telemarketing its agents and (sub)vendors performed on its behalf, it failed to investigate further despite knowledge that would have caused a reasonable person to do so. Indeed, Integrity had myriad controls, investigatory, and audit rights at its fingertips that it could have used to ensure TCPA compliance, but it elected not to do so.

52.     Indeed, Plaintiff repeatedly reached out to Integrity and its partners directly to try to get these calls to stop, to no avail.

53.     Integrity has received numerous other complaints about nonconsensual telemarketing from other consumers, too, some have resulted in lawsuits and settlements. *See, e.g.*, *Nichols v. Integrity Marketing Group, LLC*, No. 3:22-cv-05560 (alleging unwanted telephone solicitations for Integrity in violation of National Do Not Call Registry rules); *Nichols v. Integrity Marketing Group, LLC*, No. 4:23-cv-04877 (same); *Campbell v. Integrity Marketing Group*, No. 1:23-cv-00187 (W.D. Tex.) (same). Nonetheless, Integrity has failed to investigate or correct its deficient policies, practices, and procedures that resulted in the illegal calling at issue. Indeed, Integrity knows that it will continue to benefit from violations of the TCPA, but treats it like a cost of doing business instead of ensuring actual compliance.

54.    These violations were negligent. Alternatively, they were willful and knowing.

55.    Plaintiff and the classes have been damaged by these calls. Their privacy was improperly invaded, the calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. The calls were annoying and a nuisance, and wasted the time of Plaintiff and the classes. *See, e.g., Mims*, 565 U.S. at 372 (discussing congressional findings of consumer "outrage" as to unsolicited, autodialed and prerecorded calls).

### Newman Facts

56.    Plaintiff's experiences receiving telemarketing calls for products, goods, and services on behalf of Integrity are typical of other consumers' experiences receiving such. These consumers' experiences are substantially identical, because the calls are made consistent with illegal policies, practices and procedures that are set "from the top down," by Integrity itself.

57.    Plaintiff registered his residential cell phone number with the National Do Not Call Registry in 2005.

58.    Plaintiff has never transacted any business with Integrity or its partners, insurance agents, or others soliciting on its behalf. Likewise, Plaintiff has never unilaterally inquired or submitted an application regarding products or services offered by Integrity.

59.    Despite this, Plaintiff Newman has received numerous calls by or on behalf of Integrity, for the purpose of encouraging the purchase of products or services through it.

60.    For example, but without limitation, Plaintiff received the following calls to his residential cellular telephone number, which were initiated for the purpose of encouraging the purchase of products or services for Integrity:

| Approximate Date/Time | Caller ID Displayed | Attributed Downline | Prerecorded Voice Used? |
|---|---|---|---|
| November 19, 2021, at 12:55 p.m. | 520-525-9716 | Connexion Point (via Agency Incline) | |
| November 19, 2021, at 2:07 p.m. | 254-735-1336 | Connexion Point (via Agency Incline) | |
| December 7, 2021, at 3:12 p.m. | 737-248-2873 | Berwick Insurance (via agent Rozana Gaffoor-Ali and All Star BPO) | |
| December 7, 2021, at 3:40 p.m. | 813-291-1227 | Berwick Insurance (via agent Rozana Gaffoor-Ali and All Star BPO) | |
| January 16, 2022, at 6:53 p.m. | 402-320-6777 | Your Insurance Group (via agent Robert Rodgers) | |
| February 1, 2022, at 1:34 p.m. | 469-290-6469 | Family First Life (via agent Michael Williams and LeadEngin) | |
| February 18, 2022, at 11:08 a.m. | 940-665-6657 | Family First Life (via agent Jeremy Love) | |
| February 18, 2022, at 11:23 a.m. | 919-701-0347 | Family First Life (via agent Jeremy Love) | |
| February 18, 2022, at 3:13 p.m. | 940-692-2980 | Family First Life | |
| March 4, 2022, at 11:41 a.m. | 209-692-6312 | Family First Life (via agent Thaddeus Dunbar) | |
| March 4, 2022, at 11:51 a.m. | 214-772-4801 | Family First Life (via agent Thaddeus Dunbar) | |
| March 7, 2022, at 1:26 p.m. | 531-888-1705 | Family First Life | |
| April 11, 2022, at 10:51 a.m. | 432-239-8307 | Family First Life (via agent John Murphy) | |
| April 20, 2022, at 12:23 p.m. | 305-400-4768 | Family First Life (via agent Carlos Martinez) | |
| April 26, 2022, at 3:55 p.m. | 940-580-1706 | Family First Life (via agent Bella) | |
| April 28, 2022, at 10:43 a.m. | 940-370-3192 | Family First Life | Yes ("Brad" with "U.S. Benefits") |
| May 13, 2022, at 3:58 p.m. | 214-615-8037 | Family First Life (via agent Sam) | |
| May 16, 2022, at | 940-637-1790 | Family First Life | |

| | | | |
|---|---|---|---|
| 10:50 a.m. | | (via agents Chris/Anna) | |
| May 16, 2022, at 10:57 a.m. | 904-453-8842 | Family First Life (via agents Chris/Anna) | |
| May 16, 2022, at 10:57 a.m. | 940-637-1356 | Family First Life (via agents Chris/Anna) | |
| July 18, 2022, at 3:42 p.m. | 469-417-6189 | Family First Life | Yes ("Brad" with "U.S. Benefits") |
| July 20, 2022, at 4:35 p.m. | 562-260-7333 (text message) | Family First Life (via agent Michael Williams) | |
| August 4, 2022, at 4:43 p.m. | 979-233-1484 | Family First Life | Yes ("Brad" with "U.S. Benefits") |
| August 10, 2022, at 11:30 a.m. | 816-470-1949 | Family First Life (via agent Rochelle Nielsen) | |
| November 1, 2022, at 10:00 a.m. | 814-618-591 | Family First Life (via agent James Whitfield of Luther James Insurance Group) | |
| November 2, 2022, at 6:11 p.m. | 862-218-0258 | Family First Life (via agent James Whitfield of Luther James Insurance Group) | |
| November 5, 2022, at 10:35 a.m. | 862-218-0258 | Family First Life (via agent James Whitfield of Luther James Insurance Group) | |
| February 23, 2023, at 9:52 a.m. | 908-512-2864 | Family First Life (via agent James Whitfield of Luther James Insurance Group) | |
| June 29, 2023, at 3:44 p.m. | 989-422-9206 (text message) | Family First Life (via Kavel/FFL Sparta) | |
| June 29, 2023, at 8:03 p.m. | 989-422-9206 | Family First Life (via Kavel/FFL Sparta) | |
| July 11, 2023, at 11:15 a.m. | 940-663-1614 | Family First Life | Yes ("Amy" with "American Senior Citizens Care") |
| July 12, 2023, at 9:58 a.m. | 940-331-6750 | Family First Life | Yes ("Amy" with "American Senior Citizens Care") |
| July 12, 2023, at 11:30 a.m. | 940-228-5858 | Family First Life (via agent Michael Daw) | Yes ("Amy" with "American Senior Citizens Care") |
| July 13, 2023, at 4:09 | 940-748-5374 | Family First Life | Yes ("Amy" with |

| | | | |
|---|---|---|---|
| p.m. | | | "American Senior Citizens Care") |
| July 14, 2023, at 4:44 p.m. | 940-386-2514 | Family First Life | Yes ("Amy" with "American Senior Citizens Care") |
| July 18, 2023, at 8:51 a.m. | 586-224-2606 | Family First Life (via Bahnam Bahnan and FFL Sparta) | |
| July 18, 2023, at 10:29 a.m. | 586-745-5856 | Family First Life (via FFL Sparta) | |
| July 18, 2023, at 10:32 a.m. | 586-277-6753 | Family First Life (via FFL Sparta) | |
| July 20, 2023, at 12:50 p.m. | 940-357-7298 | Family First Life | Yes ("Amy" with "American Senior Citizens Care") |
| July 21, 2023, at 10:50 a.m. | 940-479-7254 | Family First Life | Yes ("Amy" with "American Senior Citizens Care") |

61.     On all or virtually all of the Integrity-related calls Plaintiff answered, the caller used a fake business name.

62.     This ubiquitous use of a fake business name during the telemarketing calls Plaintiff and other class members received was intentional: Anonymity allows Integrity's telemarketers to minimize the risk of a lawsuit like this one.

63.     At times, the caller intentionally said they were calling on behalf of a different company with better brand recognition as a rouse to try to pique Plaintiff's interest (e.g., State Farm), before trying to sell a product through Integrity. This, too, was purposeful, and designed to minimize the chance that Plaintiff and other consumers would know with whom they were speaking, and file a complaint.

64.     On information and belief, Integrity at times shares the same lead among different agents for the same consumer, resulting in multiple calls from different Integrity agents or partners—including in the case of Plaintiff, as evidenced by the numerous telemarketing calls he received from multiple Integrity agents.

**Connexion Point Calls to Plaintiff**

65.    Plaintiff received dozens of unsolicited calls telemarketing Medicare-related products to his cell phone starting in around fall 2021. All of these callers, or people he was transferred to, used generic, fake names like "Medicare Help Center," "Health One," or similar.

66.    Plaintiff repeatedly told these callers to stop calling his phone, and when this failed, Plaintiff decided he needed to find out who was behind the calling, to try to identify the caller's true identity and get the unwanted calling to cease.

67.    **November 19, 2021 (1st).** Plaintiff answered one such call to his cell phone from 520-525-9716 on November 19, 2021, at approximately 12:55 p.m., and was connected to an individual who identified himself as "Kevin Grey" with "Medicare Advisory."

68.    Mr. Grey informed Plaintiff that the purpose of the call was to discuss Plaintiff's options, and after Plaintiff answered a few qualifying questions like name and age, he tried unsuccessfully to transfer Plaintiff to an agent to try to complete a sale, before ultimately ending the call.

69.    **November 19, 2021 (2d).** Plaintiff answered a call to his cell phone from 254-735-1336 later that day on November 19, 2021, at approximately 2:07 p.m., and was connected to an individual who identified himself as "Chris Nelson." Mr. Nelson told Plaintiff that he was following up on the earlier call with Kevin Grey, and tried to connect Plaintiff with an insurance agent to try to complete a sale.

70.    When Mr. Nelson had similar difficulties transferring Plaintiff to an insurance agent, he asked if Plaintiff's phone number was on the do-not-call list. Plaintiff informed him that it likely was.

71.    **VoIP Calls.** In order to learn who was behind the calling, though, Plaintiff

provided his residential VoIP number to Mr. Nelson, who then called Plaintiff at that number and transferred him to an agent who said she was with the "Medicare Help Center"—one of the same fake names in several of the other unwanted calls Plaintiff had been receiving.

72. After Plaintiff answered some further questions, the "Medicare Help Center" representative then transferred Plaintiff to an individual who identified herself as "Patty Germany" with "Medicare Enroll."

73. Plaintiff explained to Ms. Germany that he had been receiving unwanted spam calls, and asked her to tell him who was behind them. Ms. Germany could or would not tell Plaintiff who called him, but she did identify Integrity subsidiary Connexion Point as the parent company for "Medicare Enroll" that he could contact for further assistance, with a contact number of (801) 216-3400.

74. Connexion Point is an Integrity subsidiary, which Integrity publicly identifies as a "partner" on its website. *See* https://www.integritymarketing.com/partner/connexion-point.

75. Plaintiff called (801) 216-3400 later that same day on November 19, 2021, and when that failed to yield a response, Plaintiff emailed Connexion Point directly on November 22, 2021, with a do-not-call violation complaint.

76. Plaintiff's email explained that he was receiving unsolicited, spoofed-number calls telemarketing on Connexion Point's behalf, despite being on the National Do Not Call Registry, and requested that Connexion Point identify who called him, so that he could get the calling to stop.

77. Although Plaintiff communicated directly with Connexion Point's VP of Human Resources and Recruiting Christie Hulet, and had a call a few days later with its Director of Operations, Lisa Jiminez, Connexion Point did not identify the "Medicare Advisory" caller.

78.     Connexion Point soon stopped responding to Plaintiff's emails and calls to follow up altogether.

79.     At around this same time, Plaintiff received a deluge of additional phone calls to his VoIP number, trying to sell Medicare-related insurance products. After receiving 362 unsolicited calls and a text message all soliciting Medicare-related insurance products since November 20, 2021, Plaintiff felt he had no choice but to get rid of the VoIP number. Plaintiff did so on the morning of December 7, 2021.

80.     On information and belief, including the similarities between the calls and the fact that the only person Plaintiff had ever provided the VoIP number to was "Chris Nelson" of "Medicare Advisory," the calls to Plaintiff's VoIP line were made for the purpose of encouraging the purchase of goods, products, or services on behalf of Integrity.

**Berwick Insurance Calls to Plaintiff**

81.     **December 7, 2021 (1st)**. Plaintiff answered a call from 737-248-2873 to his cell phone on December 7, 2021, at approximately 3:12 p.m., and was connected to an individual who identified himself as "John Murphy" with the "Medicare Help Center," who proceeded to try to solicit Medicare-related insurance plans.

82.     In addition to using the same business name as in earlier calls, Mr. Murphy recited the fake name, address, and date of birth Plaintiff had used in his prior calls with "Medicare Help Center."

83.     After Plaintiff answered some questions, Mr. Murphy transferred him to an agent who identified herself as Rozana Gaffoor-Ali, with Berwick Insurance, who solicited Medicare-related health plan products to Plaintiff.

84.     Berwick Insurance Group is an Integrity subsidiary, which Integrity publicly lists

as one of its "partners" on its website. *See* https://www.integritymarketing.com/partner.

85.     After Plaintiff terminated the call, Ms. Gaffoor-Ali sent Plaintiff two emails to the

email address he had provided at 3:30 p.m. on December 7, 2021. Both emails asked Plaintiff to

complete a hyperlinked "Scope of Appointment" form for Plaintiff to "select the Medicare health

plan options" he might be interested in purchasing, and making clear that Integrity was behind it

with the following header:



86.     Integrity owns the trademark for MedicareAPP.

87.     MedicareAPP is part of the enrollment and quoting resources Integrity provides to

its agents like Ms. Gaffoor-Ali, to assist in selling Medicare-related products and services

through Integrity.

88.     Agents like Ms. Gaffoor-Ali can access MedicareAPP through Integrity's

MedicareCENTER platform, which allows agents to "to record, download and store both

inbound and outbound sales calls[,]" "[c]hoose when to have leads delivered right to your

Contact Management profile[,]" and match potential plans with Integrity's consumer relationship

management ("CRM") data to aid in facilitating electronic applications. *See*

https://www.medicarecenter.com/welcome.

89.     On information and belief, Ms. Gaffoor-Ali obtained Plaintiff's phone number as

a real-time lead through Integrity itself.

90.     On information and belief, Integrity itself recorded Plaintiff's calls with Ms.

Gaffoor-Ali, and has stored data concerning the telemarketing to Plaintiff in its systems.

91. **December 7, 2021 (2d).** Ms. Gaffoor-Ali also called Plaintiff back the same day on December 7, 2021, shortly after sending the emails. Plaintiff explained that he was receiving unwanted telemarketing, and asked who called him. Ms. Gaffoor-Ali said she did not know because those were things "corporate" took care of.

92. Plaintiff reached out to Berwick Insurance by phone on December 7, 2021, and by email on December 16, 2021, to inform it that he was receiving spoofed, unwanted calls on its behalf despite prior do-not-call requests and his number's registration on the National Do Not Call Registry, but in neither instance did Berwick Insurance identify who called him.

**Plaintiff Provides Direct Notice to Integrity of Violations**

93. After numerous do-not-call requests and efforts proved futile at getting the unwanted telemarketing calls to stop, Plaintiff reached out to Integrity directly via email on December 17, 2021, to complain about the unwanted calling and try to figure who was doing it, in order to get it to stop.

94. After not hearing back, on January 4, 2022, Plaintiff emailed Integrity again, and further asked for its internal do-not-call policy.

95. Integrity again did not respond until January 10, 2022, after another follow-up email from Plaintiff.

96. Integrity did not provide Plaintiff with its internal do-not-call policy like he requested, although it was required to have one "available upon demand" under 47 C.F.R. § 64.1200(d)(1).

97. Ultimately, Integrity's counsel identified "Agency Incline" as the entity that transferred Plaintiff to Connexion Point a/k/a Senior Care Benefits in November 2021, and "All Star BPO" as the lead vendor for the call that transferred Plaintiff to agent Rozana Gaffoor-

Ali/Berwick Insurance in December 2021.

98.     Plaintiff reached out to these outfits, though, he received no further information identifying the caller; All Star BPO blocked him.

99.     On information and belief, including the fact that an email from Integrity's General Counsel Jayne Rothman on January 11, 2022, suggested that Plaintiff was only on the do-not-call list for Connexion Point, Integrity did not immediately put Plaintiff on its own internal do-not-call list (to the extent one exists) and coordinate with its other agents and their (sub)vendors to stop calls to his phone.

100.    In around February 2022, according to Integrity's counsel, Integrity advised all of its agents not to use Agency Incline and Allstar BPO, demonstrating its ability to control what vendors its agents use or do not use for lead generation and telemarketing purposes.

101.    Despite Plaintiff's direct efforts with Integrity, however, he continued to receive other unwanted telemarketing calls on behalf of Integrity to his cell phone.

**Your Insurance Group Call to Plaintiff**

102.    **January 16, 2022.** Plaintiff answered a call from 402-320-6777 on January 16, 2022, and was connected to an individual who identified himself as "Robert Rodgers" and tried to sell Plaintiff term life insurance.

103.    Though he did not disclose Integrity or any of its affiliates during the call, Mr. Rodgers was affiliated with Integrity subsidiary Your Insurance Group, LLC.

104.    Your Insurance Group, LLC is an Integrity subsidiary, which Integrity publicly lists as one of its "partners" on its website. *See* https://www.integritymarketing.com/partner; https://www.integritymarketing.com/integrity-marketing-group-expands-with-your-insurance-group.

105.    Plaintiff complained to Integrity about the call through an email to its General Counsel Jayne Rothman and others on January 19, 2022.

106.    On February 16, 2022, Integrity's counsel confirmed Integrity's relationship with Mr. Rodgers.

107.    On information and belief, the call Plaintiff received on January 16, 2022, was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

**Family First Life Calls to Plaintiff**

108.    **February 1, 2022.** Plaintiff answered a call from 469-290-6469 on February 1, 2022, after which the caller identified herself as "Erica Smith with State Farm," and proceeded to solicit Plaintiff for final expense insurance.

109.    However, this reference to State Farm was a rouse: After Plaintiff answered several questions, he was transferred to an agent who identified himself as Michael Williams, for the purpose of trying to close a sale with Plaintiff. Though he did not disclose Integrity or any of its affiliates initially, Mr. Williams texted Plaintiff his license information, which identified him as a Family First Life agent.

110.    Family First Life is an Integrity subsidiary, which Integrity publicly lists as one of its "partners" on its website. *See* https://www.integritymarketing.com/partner; https://www.integritymarketing.com/family-first-life-partners-with-integrity-marketing-group.

111.    On information and belief, this call on February 1, 2022, was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

112.    Mr. Williams identified the entity from which he received Plaintiff as a lead as LeadEngin.

113.     When Plaintiff reached out to LeadEngin to try to discuss the unwanted calling, they ignored him.

114.     Plaintiff complained about this call to Integrity's in-house and outside counsel through an email on February 18, 2022.

115.     **February 18, 2022 (1st).** During a subsequent call Plaintiff received from 940-665-6657 on February 18, 2022, the caller identified himself as "John with Senior Benefits," and proceeded to solicit Plaintiff for end-term life insurance.

116.     "John" ultimately transferred Plaintiff to an agent who identified himself as Jeremy Love, for the purpose of trying to close a sale with Plaintiff.

117.     Though he did not disclose Integrity or any of its affiliates during the call, Mr. Love was an agent with Integrity subsidiary Family First Life, as well.

118.     On information and belief, this call on February 18, 2022, was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

119.     Plaintiff complained about this call to Integrity's in-house and outside counsel through an email on February 18, 2022.

120.     **February 18, 2022 (2d).** Plaintiff received a call from 940-692-2980 later that same day on February 18, 2022, from an individual who identified himself as "James from Senior Benefits."

121.     "James" followed the same script as "John" from the earlier call, and tried to sell Plaintiff end-term life insurance.

122.     Accordingly, on information and belief, this call was, likewise, made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

123.     Plaintiff complained about this call to Integrity's in-house and outside counsel

- 22 -

through an email on February 18, 2022.

124. **March 4, 2022**. After Plaintiff answered a call from 209-692-6312 on March 4, 2022, he was connected with an individual who identified himself as "Sam with Senior Benefits." Sam explained that he was calling to see if Plaintiff would be interested in purchasing end-term life insurance.

125. After Plaintiff answered a few questions, Sam said he had a licensed agent on the line. Before transferring Plaintiff, though, Sam played a prerecorded message that purported to convey consent for autodialed calls, but said Plaintiff could revoke consent at any time.

126. Sam ultimately transferred Plaintiff to an individual who identified themselves as Thaddeus Dunbar, although the call soon disconnected due to an apparent bad connection. Plaintiff did not answer what, on information and belief, was a callback from Mr. Dunbar from 214-772-4801 a few seconds later.

127. Mr. Dunbar is an agent with Integrity subsidiary Family First Life.

128. On information and belief, both the initiating call from 209-692-6312 on March 4, 2022, and the follow-up call the same day from 214-772-4801, were made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

129. Plaintiff complained about this call and told Integrity that he revoked any consent for calling through an email to its in-house and outside counsel on March 4, 2022.

130. **March 7, 2022**. Plaintiff answered a call from 531-888-1705 on March 7, 2022, at approximately 1:26 p.m., and was connected to an individual who identified himself as "Daniel Wilson" with "Senior Benefit"—the same name as the prior calls from February 18, 2022, and March 4, 2022.

131. Mr. Wilson indicated that he was calling to solicit life insurance policies, but

abruptly hung up after unsuccessfully trying to transfer Plaintiff to an agent.

132.     On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

133.     Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on March 7, 2022.

134.     **April 11, 2022.** During a call Plaintiff received from 432-239-8307 on April 11, 2022, the caller identified himself as "John with U.S. Life," and proceeded to solicit Plaintiff for final expense insurance.

135.     After Plaintiff answered some questions in an attempt to find out who was behind these calls, Plaintiff was ultimately transferred to an agent who identified himself as John Murphy, who continued to try to close a sale with Plaintiff.

136.     Though he did not disclose Integrity or any of its affiliates initially, Mr. Murphy indicated when Plaintiff asked that he worked for "Family First Life," an Integrity subsidiary.

137.     After Plaintiff complained about having received multiple unwanted calls, Mr. Murphy used an expletive and abruptly hung up.

138.     On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

139.     Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on April 11, 2022.

140.     **April 20, 2022.** During a call Plaintiff received from 305-400-4768 on April 20, 2022, the caller identified himself as being with "Senior Care Benefits," and proceeded to try to sell Plaintiff final expense insurance or another product.

141.     After Plaintiff answered some questions in an attempt to find out who was behind

the call, Plaintiff was ultimately transferred to an agent who identified himself as Carlos Martinez.

142. Mr. Martinez sent Plaintiff his insurance licensing information, which identified him as an agent for Integrity subsidiary Family First Life.

143. Plaintiff made a do-not-call request, and explained to Mr. Martinez that he had already asked Integrity, its attorneys, and others within the Integrity family of companies to stop calling his phone.

144. On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

145. Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on April 20, 2022.

146. **April 26, 2022.** During a call Plaintiff received from 940-580-1706 on April 26, 2022, the caller did not identify himself, but instead pitched Plaintiff for final expense insurance.

147. After Plaintiff answered some questions in an attempt to find out who was behind the call, he was transferred to an agent who identified herself as "Bella" with "Family First Life."

148. Bella similarly attempted to sell Plaintiff final expense insurance.

149. After Plaintiff complained about the unwanted calling, indicated that he had already been communicating with Integrity about it, and that "your company just cannot seem to stop calling me," Bella abruptly hung up.

150. On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

151. Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on May 16, 2022.

152.    **April 28, 2022.** When Plaintiff answered a call from 940-370-3192 on April 28, 2022, he heard a prerecorded message from "Brad with U.S. Benefits."

153.    This caller used a series of prerecorded messages to communicate with Plaintiff, like with a soundboard, rather than communicating person-to-person directly (i.e., a so-called "avatar" call). This was obvious from, among other things, the prerecorded-sounding nature of the call, itself, and the odd cadence of the conversation, such as overlong pauses after Plaintiff said anything, on account of the operator needing to determine which prerecorded message to play.

154.    After Plaintiff asked for the company name repeatedly, he was transferred to a non-avatar, human representative who said he was with "Senior Benefits"—the same entity identified in other calls Plaintiff previously received on February 18, 2022, March 4, 2022, and March 7, 2022.

155.    On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

156.    Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on May 16, 2022.

157.    **May 13, 2022.** After a call Plaintiff answered from 214-615-8037 on May 13, 2022, terminated just as the person on the other end started saying hello, Plaintiff called the number back and was ultimately transferred to someone who identified themselves as "Sam" with Family First Life.

158.    Accordingly, on information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

159.    Plaintiff complained about this call through an email to Integrity's in-house and

outside counsel on May 16, 2022.

160. **May 16, 2022 (1-3).** During a call Plaintiff received from 940-637-1790 on May 16, 2022, the caller identified himself as "Chris from The Life Benefits," who proceeded to solicit Plaintiff for final expense insurance.

161. After Plaintiff answered some questions in an attempt to find out who was behind the call, Plaintiff was transferred to an agent who identified herself as "Anna" with "Family First Life."

162. The call with "Anna" dropped, and both "Anna" and "Chris" separately called Plaintiff back almost within minutes again on May 16, 2022: "Anna" from 904-453-8842, and "Chris" from 940-637-1356.

163. Plaintiff merged the two calls, and "Chris" indicated that he was actually with "Family First Life."

164. Plaintiff informed both "Anna" and "Chris" that his number was registered with the National Do Not Call Registry, that he had previously asked not to be called, and made yet another do-not-call request.

165. Plaintiff tried to find to find out who the vendor was that called him, but he was hung up on.

166. On information and belief, this calling was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

167. Plaintiff complained about this calling through an email to Integrity's in-house and outside counsel on May 16, 2022.

168. **July 18, 2022.** On July 18, 2022, Plaintiff received a call from 469-417-6189, at approximately 3:42 p.m., that played the same "Brad" from "U.S. Benefits" prerecorded avatar

that played during the call on April 28, 2022, and solicited him for final expense insurance.

169.    This time, Plaintiff was transferred to someone who introduced himself as "Paul Heyman."

170.    In order to find out who was behind the unsolicited call, Plaintiff answered several questions by Mr. Heyman, such as giving the fake name "Walter Hickman" and that his favorite color was "blue." Mr. Heyman informed Plaintiff that he could expect a call back over the next few days to discuss available plans, but then hung up the phone while Plaintiff was trying to ask further questions.

171.    On information and belief, including the connection to the prior Integrity-related calling, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

172.    Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on August 10, 2022.

173.    **July 20, 2022.** On July 20, 2022, Plaintiff received a text message from 562-260-7333, which stated:

> Hello! This is Insurance Agent Williams. You agreed to have a Insurance Agent contact you in regards to your insurance needs. I'm the Life, Accident & Health Insurance Agent assigned to help you. If you would like to go over your options I'll send you my Business Card and State License once you reply "Yes" to this message. After your "Yes" reply we can pick a date and time to discuss your needs. If you no longer want assistance with your Life, Accident, or Health Insurance coverage simply reply "Stop" or "No" and you will no longer be helped.

174.    Plaintiff wanted to know how the insurance agent obtained his information, so he replied, "Yes," and received a call from Michael Williams—the same insurance agent he complained to about unwanted calling on February 1, 2022. Plaintiff again made it clear to Mr. Williams that he did not want to be contacted.

175. On information and belief, this contact made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

176. Plaintiff contacted Integrity's attorneys via email on July 21, 2022, to inform them that he had been contacted by Mr. Williams again, and that despite all his do-not-call requests, he continued to receive unwanted telephone solicitations on its behalf.

177. **August 4, 2022.** On August 4, 2022, Plaintiff received a call from 979-233-1484, which utilized the same "Brad" from "U.S. Benefits" prerecorded-voice avatar technology that played during the call on April 28, 2022, and solicited him for final expense insurance.

178. Eventually, Plaintiff was transferred to someone who identified themselves as "Klaus" with "Senior Benefits"—the same entity identified in prior calls on February 18, 2022, March 4, 2022, March 7, 2022, and April 28, 2022.

179. Klaus indicated that they had called Plaintiff before, and restated the same fake information Plaintiff provided during the call on July 18, 2022. Klaus said they were calling to confirm Plaintiff's information and to expect a call back. This call was similarly made for the purpose of encouraging the purchase of Integrity goods, products, or services.

180. On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

181. Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on August 10, 2022.

182. **August 10, 2022.** On August 10, 2022, Plaintiff received a call from 816-470-1949, in which the caller said they were "Peter" with "Family First Life," calling to follow up on the earlier call soliciting final expense insurance. Peter repeated the same fake information Plaintiff provided during the call on July 18, 2022, such as that Plaintiff's favorite color was

blue.

183.    Peter asked Plaintiff some questions he said were to see whether Plaintiff would qualify for a plan, and indicated that he would transfer Plaintiff to licensed agent Rochelle Nielsen. The call, however, terminated before the transfer.

184.    Rochelle Nielsen is the VP of a Family First Life agency in California. *See, e.g.,* https://agent.familyfirstlife.com/rochellenielsen3970 (agent page for Ms. Nielsen on Family First Life's website, identifying it as "An Integrity Company").

185.    On information and belief, this call was made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

186.    Plaintiff complained about this call through an email to Integrity's in-house and outside counsel on August 10, 2022.

187.    **November 1, 2022/James Whitfield Calls.** On November 1, 2022, Plaintiff received a call that displayed a fake, 9-digit caller ID of 814-618-591. When Plaintiff answered, a man named who identified himself as "Mark with Senior Benefits" indicated that he was calling about a new, low-cost final expense plan that was available in Plaintiff's area. Mark indicated that an agent named "James" with "Family First Life" would call Plaintiff back. As with earlier calls, Mark asked Plaintiff to tell him his favorite color; Plaintiff said, "Green."

188.    Plaintiff answered a call he received the next day from 862-218-0258, and was connected with an individual who identified himself as "James." James said he was following up on the call where Plaintiff had said his favorite color was "green," and confirmed that they used the generic name "Senior Benefits."

189.    James indicated that he was with the Luther James Insurance Group, and that it was part of Family First Life.

190.    "James" is James Whitfield, a licensed agent for Integrity subsidiary Family First Life.

191.    Plaintiff expressed that he did not want to be called, and informed James that he had already been in contact with Integrity and its attorneys to try to get the calls to stop.

192.    James indicated that he was unaware of this, and that he had never been sent do-not-call list information from anyone at Family First Life or Integrity.

193.    James indicated that he would place Plaintiff on his do-not-call list.

194.    Based on information provided by James, the lead generator that transferred Plaintiff to James was a Pakistan-based individual named Abar Mehdi.

195.    Plaintiff has no relationship with Abar Mehdi, and he never initiated any contact with Mr. Mehdi or anyone else soliciting on behalf of Integrity to call him for telemarketing purposes.

196.    Notwithstanding Plaintiff's prior do-not-call request, Plaintiff received two additional calls from James—specifically, on November 5, 2022, which went to voicemail, and February 23, 2023, which Plaintiff did not answer.

197.    Plaintiff called James back shortly after James' call on February 23, 2023, and asked why James was calling Plaintiff again. Plaintiff made another do-not-call request.

198.    On information and belief, all of the aforementioned calls from November 1, 2022, November 5, 2022, and February 23, 2023, were made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

199.    **FFL Sparta Calls (5 Calls/Text Conversations).** On June 29, 2023, Plaintiff received the following text message from 989-422-9206:

> Hi Walter, this is Kavel with FFL Sparta. I received your request for a line ins quote. As your TX Licensed Advisor, I will advise you of your options and answer

any questions you have. Are you seeking a policy for yourself or someone else? reply 'quit' to stop.

200.   Kavel ultimately called Plaintiff later on June 29, 2023, but she abruptly hung up after Plaintiff tried to find out more information about what company she was with.

201.   Plaintiff answered a call from 586-224-2606 on July 18, 2023, at approximately 8:51 a.m., after which he was connected with an individual who identified himself as "Ben" with "Senior Life," who proceeded to try to sell Plaintiff life insurance.

202.   Shortly thereafter, "Ben"—who identified his true name as Bahnam Bahnan— texted Plaintiff coverage options: (1) Option 1, a policy term up to age 90 for $10,000, at a rate of $74/month, and (2) Option 2, a whole-life policy term for $10,000, for a rate of $184.06/month.

203.   Mr. Bahnan also identified his manager as Martin Yousif, and told Plaintiff that they had a website of https://www.fflsparta.com/.

204.   As advertised in the identified website, FFL Sparta a/k/a Sparta Financial was an agency for Integrity subsidiary Family First Life.

205.   On information and belief, the FFL Sparta referenced in the text message on July 18, 2022, was the same as the FFL Sparta referenced in the text message from 989-422-9206 on June 29, 2023.

206.   Plaintiff received a call from 586-745-5856 on July 18, 2023, at approximately 10:29 a.m., from someone claiming to be from "Senior Life."

207.   After Plaintiff hung up after saying he wasn't the person they were looking for, Plaintiff called the 586-745-5856 number back, and the person who answered confirmed that he was with FFL Sparta.

208.   After answering another call from 586-277-6753 on July 18, 2023, at

approximately 10:32 a.m., the person with whom Plaintiff was connected identified themselves as being with "Senior Life," asked for "Walter" (i.e., the fake name Plaintiff used previously), and indicated that they were trying to follow up on the $10,000 coverage plan discussed earlier that day. The call then abruptly terminated.

209.    Plaintiff called the 586-745-5856 number back on July 19, 2023, at approximately 2:26 p.m., and the individual who answered confirmed that they were with Sparta Financial a/k/a FFL Sparta.

210.    On information and belief, all of the aforementioned calls to Plaintiff were made for the purpose of encouraging the purchase of Integrity goods, products, or services.

211.    On July 19, 2023, Plaintiff emailed FFL Sparta about the continued unwanted telemarketing, despite his past do-not-call requests and his number's registration on the National Do Not Call Registry, which he followed with a further email on July 19, 2023, to request its written internal do-not-call policy.

212.    After Plaintiff received no response from FFL Sparta (and no written internal do-not-call policy), he added Integrity's in-house and outside counsel to the email chain on July 21, 2023, to address the continued, unwanted telemarketing.

213.    On August 8, 2023, Plaintiff received a letter from FFL's outside counsel (from the same firm that represents Integrity) that did not provide a written internal do-not-call policy or express any intent by Integrity or its affiliates to take steps to address the unwanted calling.

214.    **"Amy" Avatar Calls (7 calls).** On July 11, 2023, Plaintiff received a call from 940-663-1614, and heard a prerecorded-voice message from "Amy with American Senior Citizens Care."

215.    This caller used a series of prerecorded messages to communicate with Plaintiff,

- 33 -

like with a soundboard, rather than communicating person-to-person directly (i.e., a so-called "avatar" call). This was obvious from, among other things, the prerecorded-sounding nature of the call, itself, the odd cadence of the conversation, and the fact that parts of the recorded messages awkwardly cut off (e.g., the recording played "ell" instead of "hello").

216. After answering initial questions through the prerecorded-voice avatar, Plaintiff was transferred to a representative who said he was with "American Benefits" and proceeded to ask Plaintiff several qualifying questions for a plan for sale.

217. After the "American Benefits" representative tried unsuccessfully to transfer Plaintiff to a licensed agent for purposes of trying to complete a sale, the agent suggested that he could not transfer Plaintiff because he was on a do-not-call list. Plaintiff responded that the caller had already violated the do-not-call rules the second Plaintiff's phone rang, after which the representative abruptly hung up.

218. Despite Plaintiff directly telling the caller that it had violated his do-not-call rights, at approximately 9:58 a.m. on July 12, 2023, Plaintiff received another prerecorded-voice "Amy with American Senior Citizens Care" avatar call from 940-331-6750, which proceeded into a similar pitch for final expense insurance. The call disconnected shortly after the representative indicated they would transfer Plaintiff to a "product specialist."

219. At approximately 11:30 a.m. the same morning of July 12, 2023, Plaintiff received from 940-228-5858 another prerecorded-voice "Amy with American Senior Citizens Care" avatar call, which proceeded into a similar pitch for final expense insurance.

220. This time, "Amy" transferred Plaintiff to an individual who identified himself as "Bryan Morris" from "American Benefits." Mr. Morris then proceeded to try to sell Plaintiff a final expense plan, and gave him several coverage amount options, including $10,000-$15,000.

221.    Another representative, who identified as "Mike," ultimately came on the line. Mike texted Plaintiff his insurance license number and driver's license, so that Plaintiff could see who he was talking to.

222.    The text message Plaintiff received identified the agent as Michael Daw, and had Integrity subsidiary Family First Life's logo on it in two different places. Plaintiff thereafter ended the call.

223.    Plaintiff received additional calls soliciting final expense insurance using the "Amy with American Senior Citizens Care" prerecorded message, including: (1) from 940-748-5374 at approximately 4:09 p.m. on July 13, 2023; (2) from 940-386-2514 at approximately 4:44 p.m. on July 14, 2023; (3) from 940-357-7298 at approximately 12:50 p.m. on July 20, 2023; and (4) 940-479-7254 at approximately 10:50 a.m. on July 21, 2023.

224.    During the call on July 21, 2023, Plaintiff waited for the prerecorded message to stop, said he was already supposed to be on the do-not-call list, and asked if they had shared that information with the caller. The caller hung up.

225.    On information and belief, these prerecorded-voice "Amy" avatar calls were made for the purpose of encouraging the purchase of goods, products, or services through Integrity.

226.    On information and belief, Plaintiff received other telemarketing calls on behalf of Integrity, too; he expects these to be identified in discovery.

227.    As a matter of practice and policy, Integrity permits its marketing partners to use fictitious names during telemarketing calls like those Plaintiff and other class members received.

228.    Most if not all of the caller ID numbers used to call Plaintiff were spoofed. Although Plaintiff tried calling back the phone numbers that called him on several occasions,

none presented as working numbers when he did so. Indeed, the caller ID for the call on November 1, 2022, displayed nine digits instead of ten.

229. As a matter of practice and policy, Integrity permits its marketing partners to use spoofed caller ID numbers during telemarketing calls like those Plaintiff and other class members received.

230. On information and belief, many Integrity agents and (sub)vendors, including those that called Plaintiff, do not have a written internal do-not-call policy, or do not adhere to the one they have.

231. As was its practice, Integrity failed to obtain its agents and their (sub)vendor's internal do-not-call lists, and failed to coordinate such lists with Integrity's internal do-not-call list (or those of its other agents and (sub)vendors).

232. On information and belief, Integrity has also failed to ensure that its agents and other telemarketers have and utilize the do-not-call lists of Integrity's uplines—those whose products and services are sold through it.

233. Integrity's failure to obtain, coordinate, and enforce its telemarketers' do-not-call lists caused Plaintiff and numerous other consumers to continue to receive telemarketing calls for Integrity's benefit despite an earlier do-not-call request.

234. Indeed, because Integrity's internal do-not-call list is incomplete, all of the persons who requested not to receive calls from or on behalf of Integrity and its "partners" are at risk of receiving calls made on Integrity's behalf, despite such requests. *United States v. Dish Network, LLC*, 954 F.3d 970, 976 (7th Cir. 2020) (Sellers and their telemarketers must "act collectively; otherwise any household could receive endless calls peddling [a seller's] service, as long as each came from a different [telemarketer].").

235.     On information and belief, Plaintiff received additional calls telemarketing for Integrity, including after making an internal do-not-call request. Some such calls did not identify Integrity or any Integrity subsidiary, did not provide a legitimate phone number or address for them, and/or were made using a spoofed caller ID. These phone calls are difficult to identify given Integrity's improper internal do-not-call policy and practice, spoofed caller IDs, and other related missing identification or misidentification of Integrity and the caller.

## CLASS ACTION ALLEGATIONS

236.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of classes consisting of:

**Robocall Class**: All telephone subscribers in the United States whose cellular telephone number Integrity, an Integrity agent, or some other third party on Integrity's behalf called using an artificial or prerecorded voice, where prior to such call there existed no signed, written agreement with the recipient that included a disclosure informing the person signing that: (A) by executing the agreement, such person authorizes Integrity to deliver or cause to be delivered to the signatory telemarketing calls using an artificial or prerecorded voice; and (B) the person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

**National DNC Class**: All persons within the United States whose residential cellular or landline numbers Integrity, an Integrity agent, or someone else on its behalf called more than once for the purpose of encouraging the purchase of goods or services within any 12-month period, despite the phone number having been registered on the National Do Not Call Registry for more than 31 days, where Integrity did not have a signed, written agreement with the consumer stating that he or she agrees to be contacted by it at the phone number, and the person had not transacted business with Integrity in the past eighteen months or inquired as to goods or services with Integrity in the past three months or, if so, had revoked consent.

**IDNC Class**: All residential telephone subscribers in the United States (i) to whom a call was made for the purpose of encouraging the purchase of goods or services through Integrity, or to find a marketing "lead" for such goods or services, (ii) to such residential telephone line, (iii) where a do-not-call request had been made to Integrity, any of the companies whose products Integrity's agents sell through it (i.e., Integrity's uplines), or their downlines (e.g., Integrity agents and telemarketing (sub)vendors), and (iv) where there was more than one such call

within a 12-month period, at least one of which was made on or after the date four years prior to filing of this action.

**Injunctive Class**: All residential telephone subscribers in the United States who have requested that Integrity or any Integrity upline or downline stop calling them.

237. Upon information and belief, there were more than 1,000 persons who received calls as identified in each of the foregoing classes definitions in 2022, alone.

238. Repeated and protracted litigation has not slowed or curbed telemarketing like that which is alleged to have happened herein.

239. Common questions of law or fact exist as to all members of each class, which predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common include but are not limited to:

    a. Whether the calls to Plaintiff and the Robocall Class were made using an artificial or prerecorded voice as such terms are defined or understood under the TCPA and applicable FCC regulations and orders;

    b. Whether Integrity and its vendors' IDNC practices – or lack thereof – were proper under the TCPA, and whether they were properly adhered to;

    c. Whether Integrity had valid consent or prior express invitation or permission for calls to the members of the Robocall Class or National DNC Class; and

    d. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other class members are entitled to treble damages under 47 U.S.C. §§ 227(b)(3) & 227(c)(5).

240. Plaintiff's claims are typical of the claims of the other members of the classes. The factual and legal bases of liability are the same: Integrity violated the TCPA by causing spoofed, artificial- or prerecorded-voice telemarketing calls to be made to the cellular telephone

number of each member of the Robocall Class, without permission, and for the IDNC Class and Injunctive Class, failed to implement and/or honor IDNC policies that comply with the TCPA. For the National DNC Class, Integrity caused telephone solicitations to be made to people whose phone numbers were registered with the National Do Not Call Registry.

241. Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has no interests that might conflict with the interests of the classes. Plaintiff is interested in pursuing his claims vigorously, and he has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

242. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, thousands of members of each class, such that joinder of all members is impracticable.

243. No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

244. Integrity has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the classes, thereby making relief appropriate with respect to the classes as a whole. Prosecution of separate actions by individual members of the classes, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct.

245.     The identity of the classes are, on information and belief, readily identifiable from Defendant's or its agents' or (sub)vendors' records.

### COUNT I
### Violations of the TCPA's Robocall Prohibition,
### 47 U.S.C. § 227(b)(1)(A)(iii)

246.     Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this Count I on behalf of himself and the Robocall Class.

247.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using … an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

248.     Defendant initiated or caused to be initiated calls to the cellular telephone numbers of Plaintiff and the other members of the Robocall Class defined above using an artificial or prerecorded voice. These calls were made without regard to whether or not Defendant had previously obtained prior express written consent from the called party to make such calls.  In fact, Defendant did not have prior express written consent to call the cell phones of Plaintiff and the other members of the Robocall Class when the calls were made.

249.     These calls were made for non-emergency, telemarketing purposes, i.e., to encourage the purchase of goods, products, or services.

250.     These calls and violations were willful or knowing.

251.     Defendant violated the TCPA by causing non-emergency calls to be made to the cell phone numbers of Plaintiff and the class using an artificial or prerecorded voice for telemarketing purposes, without prior express written consent. 47 C.F.R. § 64.1200(a)(2).

252.     To the extent that some of the calls to Plaintiff and the class were made by agents

or vendors of Defendant, Defendant is liable for those calls, too.

253.    As a result of Defendant's conduct and pursuant to Section 227(b)(3) of the

TCPA, Plaintiff and the other members of the class were harmed and are each entitled to a

minimum of $500 in damages for each violation; treble damages if violations are found to have

been willful or knowing.  Plaintiff and the class are also entitled to an injunction against future

calls. 47 U.S.C. § 227(b)(3).

WHEREFORE, Plaintiff Wes Newman, individually and on behalf of the Robocall Class,

respectfully requests that the Court enter judgment against Integrity for:

A.    Certification of the class as alleged herein;

B.    A declaration that Integrity violated the TCPA as to Plaintiff and the
Robocall Class ;

C.    Damages, pursuant to 47 U.S.C. § 227(b)(3);

D.    Injunctive relief, pursuant to 47 U.S.C. § 227(b)(3), aimed at preventing
Integrity and its downlines from violating the TCPA in the future,
including:

1.    Prohibiting Integrity from accepting business derived from
telemarketing until it assembles and maintains a proper "master"
IDNC list;

2.    Prohibiting Integrity from accepting business derived from
telemarketing until it and its vendors implement a policy and
practice whereby all those that telemarket on Integrity's behalf
clearly disclose their identity and contact information, as well as
that they are calling on behalf of Integrity.

3.    Requiring Integrity to hire a Court-approved, independent auditing
company to (a) investigate all allegations of TCPA violations, and
(b) audit no less than 10% of Integrity and its agents/vendors'
outbound calls – including calls originating from lead generators –
to ensure that Integrity had prior express consent for robocalls, and
(c) report the results of the above investigations to the Court and
Plaintiff's counsel on a quarterly basis for no less than five years.

4.    Requiring Integrity to include a working, automated IVR opt-out

mechanism at the beginning of any and all prerecorded-voice calls, which they are required to do in all events. 47 C.F.R. § 64.1200(b).

E. Attorneys' fees and costs, as permitted by law; and

F. Such other or further relief as the Court deems just and proper.

## COUNT II
### Violations of the TCPA's Internal Do-Not-Call ("IDNC") Regulations
### 47 C.F.R. 64.1200(d)

254. Plaintiff re-alleges and incorporates all prior allegations. Plaintiff brings this Count II on behalf of himself and the IDNC Class and the Injunctive Class.

255. The TCPA requires any party that is engaged in telemarketing – including "sellers" who do not make calls themselves – to institute procedures for maintaining a list of persons who request not to receive telemarketing calls made by or its behalf. 47 C.F.R. § 64.1200(d).

256. Integrity's policies, practices, and procedures, and its actions and omissions, violated the TCPA's IDNC rules and regulations as alleged above.

257. Integrity's agents and (sub)vendors violated the TCPA's IDNC regulations, too, and Integrity should be held liable all such violations.

258. On information and belief, Integrity or its telemarketers do not maintain a written internal do-not-call policy available upon demand, or do not properly adhere to it to the extent it exists.

259. Likewise, Integrity fails to ensure that its personnel, agents, and (sub)vendors are properly trained in internal do-not-call compliance, as evidenced by Plaintiff's experience alleged herein.

260. Further, the TCPA, 47 C.F.R. § 64.1200(d), requires coordination among an insurance company its agents and vendors. *E.g., United States v. Dish Network, LLC*, 954 F.3d

- 42 -

970, 976 (7th Cir. 2020) (IDNC lists must be coordinated among vendors).

261.    Integrity has failed to coordinate internal do-not-call request information among its uplines and downline agents and (sub)vendors, such that neither Integrity nor any of its agents or (sub)vendors has a complete internal do-not-call list.

262.    This failure by Integrity means that *no call* – whether initiated by Integrity or any person on its behalf – has *ever* been properly scrubbed for internal do-not-call compliance against a complete internal do-not-call list. This has resulted in continued unwanted telemarketing to Plaintiff and other consumers, whose do-not-call requests are not honored.

263.    Calls made on Integrity's behalf likewise failed to properly disclose the caller, the person or entity on whose behalf the call was being made, or a telephone number or address at which the person or entity may be contacted. Indeed, as Plaintiff experienced, many of the calls at issue utilized spoofed caller IDs or fake names.

264.    The fact that Integrity and those that telemarketed on its behalf did not properly identify themselves prevented consumers from understanding from whom they were receiving calls, and deprived them from having the TCPA-mandated tools and information needed to make a do-not-call request, further preventing Integrity from developing a complete internal do-not-call list.

265.    Integrity also should be held liable for its and its telemarketers', vendors', and agents' other failures to comport and comply with the IDNC regulations, as alleged herein.

266.    Indeed, the TCPA makes clear that no seller may make or accept business derived from telemarketing unless it and its telemarketers have – and adhere to – written policies that comply with the TCPA. 47 C.F.R. § 64.1200(d).

267.    Because neither Integrity nor its telemarketers or agents complied with the

TCPA's IDNC requirements as alleged herein, ***none*** of the telemarketing calls made by or on behalf of Integrity were permissible. 47 C.F.R. § 64.1200(d).

268.     These violations were willful or knowing.

269.     As a result of Integrity's violations of the TCPA's internal do-not-call rule, Plaintiff and the other members of the IDNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

270.     Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

271.     To the extent Integrity did not physically "initiate" the calling at issue itself, it is nonetheless vicariously liable based on theories of actual authority, apparent authority, and ratification, for these calls made on its behalf.

WHEREFORE, Plaintiff Wes Newman, individually and on behalf of the IDNC Class and Injunctive Class, respectfully requests that the Court enter judgment against Integrity for:

A.     Certification of the IDNC Class and Injunctive Class as alleged herein;

B.     A declaration that Integrity violated the TCPA as to Plaintiff and the IDNC Class and Injunctive Class;

C.     Damages, pursuant to 47 U.S.C. § 227(c)(5);

D.     Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Integrity from violating the TCPA in the future, including:

1.     Prohibiting Integrity from accepting business derived from telemarketing until it assembles and maintains a proper and complete internal do-not-call list;

2.     Prohibiting Integrity from accepting business derived from telemarketing until it and its vendors implement a policy and practice whereby all those that telemarket on Integrity's behalf clearly disclose their identity and contact information, as well as that they are calling on behalf of Integrity.

3.  Requiring Integrity to hire a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Integrity and its agents' and (sub)vendors' outbound calls – including calls originating from lead generators – to ensure that the telemarketer and Integrity are identified at the beginning of calls, and that the consumer had not previously asked that calls stop, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis for no less than five years.

4.  Requiring Integrity to include a working, automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls, which they are required to do in all events. 47 C.F.R. § 64.1200(b).

E.  Attorneys' fees and costs, as permitted by law; and

F.  Such other or further relief as the Court deems just and proper.

## COUNT III
### Violations of the TCPA's National Do Not Call Registry Regulations
### 47 C.F.R. § 64.1200(c)(2)

272.    Plaintiff re-alleges and incorporates all prior paragraphs.  This Count III is brought by Plaintiff on behalf of himself and the National DNC Class.

273.    It is a violation of the TCPA to initiate any telephone solicitation to a residential telephone subscriber who has registered his or her residential landline or cellular telephone number on the National Do Not Call Registry. 47 C.F.R. § 64.1200(c)(2).

274.    Upon information and belief, Integrity or its agents and (sub)vendors did not scrub their call lists against the National Do Not Call Registry, as the TCPA required it to do.

275.    Integrity violated the TCPA by initiating or causing to be initiated multiple telephone solicitations to Plaintiff and the other members of the National IDNC Class in a 12-month period, despite the person's registration of his or her telephone number on the National Do Not Call Registry.

276.    These violations were willful or knowing.

277.     As a result of Integrity's violations of the TCPA's National Do Not Call Registry rule, Plaintiff and the other members of the National DNC Class are each entitled to an injunction and up to $500 in damages for each such violation. 47 U.S.C. § 227(c)(5).

278.     Because such violations were willful or knowing, the Court should treble the amount of statutory damages, pursuant to 47 U.S.C. § 227(c)(5).

279.     To the extent Integrity did not physically "initiate" the calling at issue itself, it is nonetheless vicariously liable based on theories of actual authority, apparent authority, and ratification, for these calls made on its behalf.

WHEREFORE, Plaintiff Wes Newman, individually and on behalf of the National DNC Class, respectfully requests that the Court enter judgment against Integrity for:

A.     Certification of the National DNC Class as alleged herein;

B.     Damages, pursuant to 47 U.S.C. § 227(c)(5);

C.     Injunctive relief, pursuant to 47 U.S.C. § 227(c)(5), aimed at preventing Integrity from violating the TCPA in the future;

D.     Attorneys' fees and costs, as permitted by law; and

E.     Such other or further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: April 19, 2024

WES NEWMAN, individually and
on behalf of others similarly situated

By:  */s/ Alexander H. Burke*

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

### **Document Preservation Demand**

Plaintiff demands that Integrity preserve all records, and direct that all subsidiaries, (sub)vendors, agents, and other third parties with relevant documents or data do so, too. Integrity should obtain all call data, lead data, and other relevant documents from all applicable (sub)vendors or third parties – particularly if they are located overseas – ***before*** terminating or otherwise taking any steps that might alter its relationship with them. Our experience is that lead generators and other vendors often remove customer access to call records upon termination. Integrity should gather these records first, before taking any steps that might remove access to these types of records. Plaintiff will assist with reasonable costs of preservation; please contact the attorneys listed here to discuss.